(Hamilton County Court of Common Pleas.)

STEPHEN H. WILDER ET AL. *v.* THE CITY OF CINCINNATI, a corporation, etc., ET AL.

Where a municipal corporation has legally erected a public market-house in a public street, thereby appropriating a considerable portion of the width of the street, a court of equity, at the instance of the owners of property abutting on such street, will enjoin such corporation from licensing hucksters and others to use the remaining portions of the width of the street, for market purposes, in such a way as to interfere for many hours each week with the ingress and egress to and from such property and the street.

HOLLISTER, J.

The plaintiffs are the owners, each of separate lots fronting on the north side of Sixth street, between Elm and Plum. Until the year 1818, Sixth street was 66 feet wide. In that year, Jacob Burnet, who owned the property abutting on both sides thereof between Elm street and Western Row, now Central avenue, made a deed to the "mayor, recorder, and trustees of the town of Cincinnati," which witnessed:

"That the party of the first part, (Jacob Burnet), for and in consideration of the establishment and continuance of a public market on Sixth street, between western Row and Elm street, hath granted, bargained and sold to the party of the second part, and their successors in office:

"All that lot or strip of ground situate on the north side of Sixth street extending from Elm street to Western Row; fifty-four feet wide, bounded south by Sixth street; west by Western Row; north by a line parallel to Sixth street, fifty-four feet north of the same; and east by Elm street, with all the privileges and advantages of the same."

"To have and to hold the said lot with its appurtenances to the party of the second part and their successors in office, for the use and purpose before mentioned, and no other."

The plaintiffs' lots abut on the north line of this fifty-four feet strip, which now, and ever since the time whereof the memory of man runneth not to the contrary, has been incorporated into and used as a part of Sixth street, and made the street with its original 66 feet, 120 feet in width.

Hon. William S. Groesbeck, son-in-law of Jacob Burnet, remembers the street as widened and paved, as far back as 1835, and that there was a market therein at that time, in the sense that wagons stood in the middle of the street, and on market days, farmers and others, backed their wagons up to the curb on both sides of the street. This use of the street continued uninterruptedly until July 22, 1892, when the board of legislation passed an ordinance establishing markets for the sale of all articles usually sold in markets, in Sixth street, to be held on Mondays, Wednesdays and Fridays, from daylight in the morning to 11 A. M., and on Saturdays from 12:30 P. M., until 10 P. M. The ordinance provided for the renting of stalls in the market house on Sixth street, between Plum and Central avenue, and of "outside benches and stands," for which a stipulated rental was charged.

Under this authority, licenses were issued to several persons who, on market days, back their wagons, containing the commodities in which they deal, up to the curb; spread their tables or stands upon the sidewalk next to the curb, and from which stands so placed, vend their wares.

Every alternate six months, the market is held on the north side of Sixth street, and during market hours, which practically comprise not less than sixty hours during the six working days of the week, wagons and

stands so completely bar the access to the stores in plaintiffs' premises, which are occupied by their tenants, commission merchants, so-called, who deal in country produce at wholesale, that it is impossible to receive freight transported from the railway stations or elsewhere, or to load into wagons for delivery during market hours.

It is in evidence in this case, that prior to 1892–1893, this use of Sixth street was acquiesced in by the plaintiffs or their grantors; or at all events, that no complaint calling for judicial action was made.

In 1892, the executors of Mary E. Holroyd, complying with the directions of her will, the consent of the city having been obtained, as shown by the ordinance of 1890, accepting the bequest of Mrs. Holroyd of a flower market in memory of Jabez Elliott, and designating the place for its erection by her executors, began the construction of a permanent iron and glass building, 200 feet in length and 35½ feet in width, for the purpose of a flower market, on Sixth street, between Elm and Plum.

Injunction was sought by some of the present plaintiffs on the ground "that the occupation of the public street by a building of such dimensions would greatly interfere with the public travel thereon; interefere with and obstruct the ingress and egress to and from plaintiffs' properties, and render many of plaintiffs' buildings valueless for the business for which they are now occupied and for which they were built, and would greatly depreciate the value of the land upon which they stand, and that such an obstruction to the public street would work great and irreparable damage to said property."

The meaning and extent of the grant by Burnet was directly passed upon by the Superior Court of Cincinnati in General Term in the injunction suit, *Fenton et al.* v. *Executors of Holroyd*, 28 Bull. 223. The court say, Judge Hunt delivering the opinion:

"There can be no doubt that this was wholly vacant property at that time. It is evident that the grant was made with the intention that the city should have the full benefit of that tract for the purposes of a market, and that the municipal authorities alone could determine when the necessity existed for the erection of a market house, as well as the extent and character of the structure itself. It is but fair to presume that the grantor had in view the fact that increased facilities would be demanded by an increasing population;" and, among other things, "The grant in this case implies the right in the city of Cincinnati to use any and all portions of the property so granted for the purpose of a market so far as may be necessary and reasonable."

And in conclusion it is said: "The only question then for the court to decide is whether the city, by the erection of the proposed building in this square for the purpose of a flower market, is making an unnecessary and unreasonable use of the grant. The equitable powers of the court probably might be invoked to restrain the erection of a building unnecessary in extent or character, and which would work irreparable injury to abutting property. But the evidence fails to show that the proposed structure will either injuriously affect such property owners in the matter of egress and ingress, or will discommode the general public to any extent in the use of the streets."

What that evidence was does not appear, but the plaintiffs in this case complain that since the erection of the flower market building, the conditions are such that they are entitled to the protection of a court of equity.

It appears that on market days, the hucksters' wagons backed up to the curb, extend in an almost unbroken line, nearly, if not quite, to Elm street, with occasional spaces between wagons of about five feet; that the wagons extend to within two or three feet of the north rail of the car track

and that the south rail is so near the flower market building that there is only space enough for the passing of street cars, which move in continuous procession with but short intervals of time between the passing of the cars; that during market hours, it is impossible to use the street for the ordinary purposes for which streets are used; that public travel is congested and frequently stopped altogether; that it is impossible to deliver goods to the commission merchants in plaintiffs' buildings, or for freight to be moved from the sidewalk, and that by the construction of the flower market building and the occupancy by the hucksters of the streets and sidewalks, Sixth street during market hours has practically lost its identity as a street in the ordinary sense, and has become almost entirely a market. It appears also that since the erection of that structure, the property of plaintiffs' has depreciated in value, and that at least one of the plaintiffs is threatened with the loss of tenants.

Under this state of affairs it is necessary to decide whether or not the plaintiffs have any rights which a court of equity is bound to protect.

That Sixth street to its entire width was, before the erection of the flower market, subject to the control and direction of the city authorities in the establishment and regulation of market houses and markets, and that the city had the power to construct the flower market cannot now be denied, for the Supreme Court declined to permit the plaintiffs to file a petition in error to the decision of the superior court. The only limitation to such control and use was that it should not be unnecessary and unreasonable, nor interfere with the abutting property owners' ingress or egress. By the terms of the grant, and by user, Sixth street was still a street, open to public travel, and the abutting property owner had the same peculiar rights therein as the abutter upon any other street so long as they were not inconsistent with the use of the street as a market; and conversely the city had the right to establish a market therein only so far as was not inconsistent with the use of the street as such. Both uses could co-exist, but neither could be permitted to the exclusion of the other. It could not be all market or all street. Such absorption by either use would not be consistent with the grant, nor with the construction placed upon it, since surely so far back as 1835, by the public, by the frequenters of markets, and by the abutting property owners. The street was open to the common use of all, both for street and for market purposes, so far as was possible, the use being to some extent inconsistent.

Now, ordinarily, the city has no right to construct a market-house in a public street. *Wartman* v. *Philadelphia*, 33 Pa. St. 202; *Mayor, etc., of the City of Columbus* v. *Jaques*, 30 Ga. 506. But under the terms of the grant by Jacob Burnet, the case of *Fenton* v. *Executors of Holroyd* decides that the entire street to its full width was subject to use as a market, and that, as the grant was to be construed, "as implying in the city everything necessary to the complete and full enjoyment of the grant," the city could appropriate a part of the width and length of the street exclusively for market purposes, if only the part appropriated was necessary and reasonable for the purpose, and did not interfere with the abutting property owners' ingress and egress.

Manifestly, the city could not erect a market-house by a solid construction extending across the entire width of the street. Such structure might, under some circumstances, be necessary to provide adequate market-house facilities; but it would be an unreasonable use of the street for market purposes; unreasonable because the public and the abutting property holders have a vested right in the use of the street as a street, and such power cannot be construed out of the letter or spirit of the grant, nor from the construction put upon it by the public and property owners, including Jacob Burnet, from time immemorial.

That the property owners have a vested right in the street in front of their premises as incident to their ownership of abutting property, "an incidental title to certain facilities and franchises, assured to them by contracts and by law, and without which their property would be of comparatively little value." *Crawford* v. *The Village of Delaware*, 7 Ohio St. 459; and cases cited in *Pruden* v. *City of Cincinnati, ante*, 1 Nisi Prius Rep. 340, cannot be doubted.

Their right is not interfered with by the construction of the flower market, for ample space is left between the north line of that structure and the north curb line; but so soon as that space is occupied for market purposes, the situation is such, by reason of that construction, and the hucksters' wagons backed up against the curb, the occupancy of the sidewalks and the crowding of the few feet between the wagons and the flower market, already subject to use by the street cars, that the property owner, during market hours, has practically as little opportunity for using the street and sidewalk in front of his property for ingress and egress to and from it to and from the street, as if the flower market extended all the way to the curb line.

The inference to be drawn from *Fenton* v. *Executors* is clear, that if the market-house had been constructed in such a manner as to interfere with the property owners in egress and ingress, its construction would have been enjoined; necessarily any other additional appropriation of the street for market purposes, which would have the same effect, is open to the same objection, unless the property owner receives compensation. And this conclusion is based on principles and authority, as shown. *Crawford* v. *Delaware*, 7 Ohio St. 459; *Railway Co.* v. *Lawrence*, 38 Ohio St. 41; *Railway Co.* v. *Cumminsville*, 14 Ohio St. 524; see, also, *Branahan* v. *Hotel Co.*, 39 Ohio St. 333.

The City should be enjoined from permitting hucksters or farmers from obstructing the ingress and egress to the plaintiffs' premises.

As to that part of the street not within the confines of the flower market, the market should be held at such places and in such a way as not to interfere with the ingress and egress pertaining to such property of the plaintiffs as abuts on that part of the street.

It is of no consequence that for more than twenty-one years the plaintiffs or their grantors have acquiesced in a use of the streets of which they now complain. *Herrick* v. *Cleveland*, 7 C. C. Rep. 470; and it seems, on principle, that they cannot be compelled to lose all of the advantages belonging to their property as incident to its location.

A decree may be taken in accordance with this opinion.

*Mallon, Coffey & Mallon* and *O. J. Cosgrave*, for plaintiffs.

*F. Hertenstein, F. Hassaurek*, and *John P. Murphy*, for the City.